Bosworth, J.
This action is brought by an individual creditor of Judson, having a judgment against him on which an execution has been issued and returned unsatisfied, to set aside a transfer of property made by Judson to Cranston. The transfer was made December 5th, 1854. It was a transfer by Judson of his interest, as a partner of Cranston, in the lease and premises, known as the Hew York Hotel, with its stock, furniture, fixtures, and the good will of the business. The transfer is sought to be set aside on the ground that it was made without consideration, and with intent to hinder, delay, and defraud the creditors of Judson.
Whether the transfer was made with such an intent is a question of fact and not of law.
The printed case, in addition to the pleadings and evidence, contains a formal statement of the conclusions of fact, which the Court found to be established by the evidence.
The case then proceeds to state, that, “ thereupon the Court rendered the following judgment.”
Unless the conclusions of law are embodied in and enunciated by the “judgment,” they do not.appear in the printed case. If that, which is called in the case a “ statement of the facts,” “ established by the evidence,” contains a statement of every conclusion which the Court found as a conclusion of fact, then the conclusions enunciated in the “judgment” should be regarded as the Court’s “ conclusions of law” upon the special facts so stated to have been found. The only conclusions stated in the judgment, which should, under such circumstances, be treated as conclusions of fact, and to have been intended to be so stated, are those, which, when found at all, must, from their nature, have been necessarily found as facts.
In this view, the Court held, as legal conclusions from the facts stated to have been found, that the transfer by Judson, of *305 his interest in the New York Hotel, was .made with intent to defraud his individual creditors.
That the four instruments of the 5th of December, 1854, were “ one single transaction,” and were made with intent to defraud the individual creditors of Judson. It is quite obvious from the opinion of the Court, that these were found as conclusions of law.
In the statement of the facts which the Court found to be established by the evidence, it is not found as a fact, that either of the four instruments was made with intent to hinder, delay, or defraud any one.
The only thing, as to the intent of the parties, contained in the statement of facts, is, that the compensation agreed to be paid for the future services of Mr. and Mrs. Judson “was made payable to her, with the avowed object of keeping it from the reach of his creditors.”
It is necessary, in order to present this case properly, to advert to some of the controlling facts, as the Court found them, and as we may think it ought to have found them—on the evidence before us.
These four instruments were executed and delivered on the 5th of December, 1854. At that time Cranston had instituted an action to obtain a dissolution of the firm, in consequence of the misconduct of Judson, and had obtained and served on Mm an injunction, prohibiting him from interfering with, the business or property of the firm.
The Court had no right, under such circumstances, to find or conclude that Cranston would not have accepted of the agreement for a dissolution, even if no other agreement could have been obtained from Judson. If he could have obtained no other he would have accepted of that, and closed the business as he thought best, or might be able, and have had the rights of himself and Judson adjusted, in the action brought for the purpose and then pending.
The Court found correctly that Judson had borrowed, on paper made by him in the firm’s name, $25,000, most or all of which he had used for individual purposes, and that this was done without the consent or knowledge of Cranston.
That charging Cranston with the value of the co-partnership *306 assets, and crediting Mm with, the balance due to him for capital contributed and not drawn out, and also with the debts owing by the firm, including this $25,000, on the assumption that he had undertaken to pay them, Judson would be a debtor of the firm to the amount of $6,308 98.
If it be true that Cranston, in consideration of the transfer to Mm, by Judson, of Ms interest in the hotel, agreed to pay, either absolutely, or, in the first instance, all the debts owing by the firm, and also this $25,000, and if it be true, that, in taking the property at the estimated value of $132,354 03, he took it at its full and fair value, and for more than could be got for it at public or private sale, then it was impossible that any individual creditor of Judson could be defrauded by it. If on such a state of facts it was the intent of the parties to defraud the individual creditors of Judson, it was an intent which could not be carried into effect, for the reason that the whole interest of Judson was insufficient to pay Ms proportion of the partnership liabilities, and the amount owing from him to his co-partner on a correct adjustment of their co-partnership business.
It is, in our opinion, of vital importance to ascertain the truth in relation to this branch of the case, and proceed from it, as a point of observation, to consider the other issues of fact presented by the pleadings.
■ The Court found that in estimating the property and assets of the firm at $132,354 03, the good will of the establishment and of its business was not estimated and included.
In this, we think the Court erred. Cranston, on the dissolution, purchased the good will, in the same sense, and as absolutely, as a matter of fact, as the firm had previously purchased it of Monnot.
In each instance the property was valued, not with reference to the prices it would be worth to use anywhere, or'to sell again, or for which like articles could be bought from those who kept them for sale, but with reference to their then position and ‘use, and the advantages of continuing the business, in the prosecution of which they were then employed, with the prospects then existing as to its future duration at the same place.
We think no one will pretend, for a moment, upon the evidence brought before us, that. Cranston, or any one else, would *307 have paid anything like $132,354 02 for this property, with the certainty that it must be removed at once, or as soon as it could be conveniently done, and used elsewhere.
We must, therefore, in considering and passing upon the merits of this controversy, regard all of the goodwill of the establishment, as estimated and included in the sum of $132,354 03.
The Court found, as a fact, that Cranston did not assume the payment of the $25,000.
We think this conclusion is erroneous. The testimony is explicit that Cranston did agree with Judson, to pay it. He was liable to pay it, and could not avoid paying it, if his means were sufficient to pay it.
If clear verbal proof of the fact, that Cranston agreed to pay the $25,000, is competent evidence to establish it, and if a finding of such a fact contrary to the effect of clear and explicit verbal evidence in relation to it, is erroneous, then it was incorrectly found, that Cranston did not agree to pay the $25,000.
Then the case stands thus: Judson transferred his interest to Cranston, and the latter agreed to pay more than Judson’s interest was worth. He paid more than it was worth, including the good will, of the existing business viewed as one to be continued, if we are to determine its worth by any reliable estimate of it disclosed by the evidence.
Whether Cranston agreed to pay all the debts absolutely including the $25,000, without recourse to Judson for any balance that would be due on a proper accounting, or whether he merely agreed to pay it, in the first instance, retaining the liability of Judson for any balance that might be found due from the latter, upon a fair and proper adjustment of the accounts, is a matter of no consequence, irrespective of other facts, so far as the question of an intent to defraud the individual creditors of Judson, by making such transfer is involved.
In either aspect, nothing was transferred to Cranston, to which the individual creditors of Judson had any right. It all belonged equitably, to the creditors of the firm. The transfer was made with the intent, and to the end that it should be so applied.
It was, therefore, as the case is presented by the evidence before us, a physical and legal impossibility that the individual *308 creditors of Judson, should be defrauded by such a transfer,, and application :of Judson’s interest in this property. To find an actual intent to defraud, under, such circumstances, the evidence of.it should be. too cogent to be resisted.
. If the Court had found these facts, as.we think the evidence establishes them, and had not attached any consequence to the consideration that Cranston’s agreement to pay the debts including the $25,000, was not in writing, but was verbal merely, we cannot think it would have found the transfer to have been made, with an intent to defraud the individual creditors of Judson, unless there are other facts, not yet adverted to, which warranted such a conclusion. . .
So far as we have now advanced in considering the . case, we think the conclusions just, that the. dissolution was a result to which Cranston had an absolute right, and one upon which he would have insisted at all events, and that the transfer of Judson’s interest was made upon.a full and adequate consideration, and that the property transferred was insufficient to pay Judson’s proportion of the copartnership, liabilities, and that it was impossible to have, defrauded Judson’s individual creditors thereby; that the conclusion that the.transfer was made with such an intent is unnatural, and not warranted by the facts thus' far- stated.
The Court also found, that no agreement- was, in fact, made, to the effect, that Judson would, or might be taken back as a partner of Cranston, in this business, if he should succeed in making an arrangement with his creditors.
. One of the agreements of the 5th of December, 1854, stipulated that Cranston would employ Judson and his wife, during the term of the then existing lease, or of any renewal - of it which Cranston might obtain, and so long as he should continue proprietor of the hotel, and pay for their services, in addition to boarding them and their family, and allowing them to use the rooms they then occupied, at the rate of $5,000 per annum, if the profits amounted to that, but such profits were not to be paid, until the end of the employment, nor unless on an accounting then had, it should be ascertained that that amount of profits had been made.. -
. In considering the degree of importance which should be attached to this contract, and the effect that should be given tq *309 it, it should be kept constantly in mind, that Judson had fraudulently involved the firm in liabilities; was individually insolvent, and that his whole interest in the partnership effects, was insufficient to pay his proportion of the partnership liabilities including the $25,000.
His agreement to render future services, was not a transfer of existing property. Those services he might refuse, or become unable to render. A failure or refusal to render services would be an end of that part of the contract.
Unless profits were made, he would receive nothing for the services of himself and wife, beyond the board and lodging of themselves and family. The $5,000 per annum, if it should become payable, would be payable out of property to be subsequently acquired by Cranston, and by reason of the future profits of his business equalling that sum. H either the then creditors of Judson, nor his future creditors, would have any right, legal or equitable, to so much of his earnings from time to time, as might be required for the support of his family.
Whatever a debtor may have earned within sixty days preceding an order, that he apply his property to the payment of his debts, which may be necessary for the use of a family, supported wholly or in part by his labor, is by law placed beyond the reach of his creditors. Code § 297.
Judson, by this agreement, did not acquire a right to the use of any property for an hour, unless, and except upon the condition that, he should continue to render services of more value, than the use of such property.
It placed him in a position that, by performing his part of the contract, he might support his family, and if the business was prosperous, might earn something in addition. But whatever he might earn, was not to be earned at the expense or prejudice of his existing creditors.
It is not a case, justifying the inference, that a debtor has transferred his property upon terms which are unjust or inequitable as it respects his creditors, on the condition of obtaining, wholly or in part, a future support out of it, and as a part of its price.
If it might be found, properly, upon the evidence, that Judson made the execution of the transfer of his interest depend upon the fact that such an agreement for the employment of himself *310 and wife was made, instead of its being necessarily evidence, under the peculiar facts and circumstances of this case, that he transferred such interest, with intent to defraud his individual creditors, it would be evidence that in addition to obtaining for the interest transferred more than it was worth, and in a way just to his creditors, he availed himself of the embarrassments of Cranston, occasioned by his own misconduct, to extort from Cranston’s apprehensions of being reduced to personal insolvency, if the property should be sold and the business closed by a receiver, a bargain which Cranston’s hopes of the future, and his fears of the present, would alone induce him to make.
That agreement, whatever it was, was assigned to an individual creditor of Judson, within nine days of its date, and Judson at the time covenanted with such creditor to perform the services which it bound him to perform. Mrs. Judson assented to the transfer. That may not be a fact of much legal import; .but in judging the intent of parties from their acts, it should not, perhaps, be wholly overlooked.
So far as the fact of this transfer illustrates the intent of Judson at the time, it tends to show an intent, after having provided for the payment of all his copartnership liabilities, to make the future.services of himself and his wife subservient to the claims of his individual creditors, and pledge them, in advance of their being rendered, to pay individual debts.
The individual creditor of Judson, to whom this contract was assigned, compromised with Cranston all claims that he could ever have under it, and, with the assent of Judson and wife, released Cranston from all liability under it, and they thereupon left the hotel. The release was made on the 10th of February, 1855.
The effect of that branch of the transaction was after providing for the payment of the creditors of the firm, by means which they have adopted, and in a manner of which they have approved, to secure payment of an individual creditor, to the amount of $6,000, without Cranston’s having received any equivalent for the $6,000, unless he found it in being released from all connection with Judson.
We think the fact of making this agreement with Judson, for the services of himself and wife, considering the peculiar *311 circumstances under which it was made, furnishes no satisfactory evidence that Judson transferred his interest in the hotel, with intent to defraud his creditors. That the transfer of this agreement, on the 10th day after its date, to an individual creditor, accompanied by his covenant to perform the services which he was bound to render, to entitle him to anything under it, repels the idea of its being the actual intent of any party to it, at the time it was made, to defraud the individual creditors of Judson.
That the Court is not justified in finding, as a conclusion of. law, an intent to defraud, against clear evidence that the actual intent was honest, and that the transaction was one by which the individual creditors of Judson could not be defrauded.
If these views are sound, there is nothing in any part of the transactions to justify the conclusion of an actual intent to defraud the individual creditors of Judson, unless it can be found in the instrument, called the mortgage for $25,000) and the facts established in relation to it.
On this appeal, our first duty is to determine, whether the facts found are warranted by the evidence. When we have determined what facts, as found, are warranted by the evidence, it then remains to be considered, whether the facts correctly found are sufficient to uphold the judgment, or order, however those erroneously found might properly be found, upon any evidence which could be given. If the facts correctly found, are not, when thus viewed, sufficient for that purpose, the judgment, or order, must be reversed.
The Court, on appeal, is not at liberty to find such facts, as the evidence, in its judgment, may establish, and pronounce judgment according to their legal effect. When its finding of facts differs from that of the Court at Special Term, the Court must necessarily order a new trial, when material facts are erroneously found.
The allegation of the answer, in respect to the mortgage, is, or clearly implies, that although Cranston had assumed to pay the $25,000, in the first instance, as well as the legitimate debts of the firm, yet there was to be an accounting between him and Judson, and, on such accounting, Judson would be largely indebted to Cranston, and that the mortgage was given to secure *312 such indebtedness as should, on such accounting, be found due from Judson to Cranston.
The Court has not found, among its conclusions of fact, for what purpose it was made. It does not appear from the conclusions of fact, which the Court held to be established by the evidence, whether it was executed for such a purpose, as the answer affirms, or whether, as was' contended on the argument of this- appeal, it was executed to indemnify Cranston against liabilities then undisclosed, which, it was feared, Judson might have created by a fraudulent use of the firm’s name, and which would be asserted and enforced against Cranston, or whether it was made for some other and different purpose.
If made for either of the two purposes first named, it is not claimed that such purpose, of itself, would make the transaction fraudulent. . It is conceded, as we understand the argument made; that if it appeared clearly, that it was made for either of those purposes, and such purpose was disclosed by the terms of the mortgage itself, it would not only be no-evidence of a "fraudulent intent, but, on the contrary, the mortgage would be valid.
"If . that be so, then the question might arise, whether Cranston is at liberty, as against the creditors of the mortgagor, to show the' Teal purpose, and have the transaction determined by its real character and according to the actual intent of the parties; or, whether there is something in the terms of the instrument which demonstrates a fraudulent intent, which no parol evidence of.actual intent can be permitted to overcome.. That question we deem it unnecessary to decide on this appeal—for reasons subsequently stated. The “opinion” of the Court at Special Term, shows that the. Court came to the conclusion, that this mortgage was executed to secure Cranston against such liabilities as had been fraudulently created by Judson in the firm’s name for his private benefit, and which, as then ascertained, amounted to $25,000.
But it does not appear by the facts found by the Court, that the Court came to that conclusion.
The mortgage is good on its face. That it was made and accepted with an intent to defraud the individual creditors of Judson, must be established, if at all, by proof of facts not indicated by the terms of the mortgage.
*313 It is not found, by that part of the case which professes to state the Court’s conclusions of fact, that it was made with an intent to defraud.
It was found that the transaction sought to be impeached by this action, was evidenced by the four instruments, all executed, signed and delivered at the same time.
But that does not enable us to reach the conclusion, that the transfer of Judson’s interest in the partnership assets, was, in fact or intent, a fraud upon the creditors of Judson. We have already stated our conclusion, that neither of the other three instruments, in connection with the facts proved, furnish evidence sufficient to justify" the conclusion of an intent to defraud. The mortgage, looking only at its face, is no evidence that the mortgage or the other papers were executed with such an intent.
To justify the inference, that even the mortgage itself was executed with that intent, it is indispensable that facts justifying that conclusion should be proved and found as facts by the Court.
We think there is no ground, on the evidence before us, to pretend that Judson would not have executed the other papers signed by him, if he had not been asked to execute the mortgage, nor that Cranston would not have taken the agreement for a dissolution, and the instrument of transfer, and have executed the service paper (as it is called), although Judson might have absolutely refused to execute the mortgage.
It is not found, that the execution and delivery of the mortgage was made a condition of the executing and delivery of the other papers, or of either of them.
But, assuming the mortgage to be invalid as against the individual creditors of Judson, is it necessarily so complicated with the transfer of his interest in the New York Hotel, as to form an essential part of the intent of making that transfer, and thus vitiate the latter, although the latter was clearly made for equitable purposes, and with an actual honest intent?
The property mortgaged is entirely distinct from that transferred. It was not mortgaged to indemnify Cranston against any liability which he assumed to satisfy, as a consideration for such transfer, nor to furnish him with means to discharge such liabilities. If it was given to secure any balance that might be *314 due from Judson on a proper accounting, or to indemnify Mm against any liabilities fraudulently created by Judson in the firm’s name, and then, undiscovered, it was given for a lawful purpose and to secure an individual debt, in respect to which the claims of Cranston were as meritorious as those of any other individual creditor of Judson.
The mortgage and the instrument of transfer do not, in terms, refer to each other, nor relate to the same subject matter. They relate to entirely distinct and disconnected items of property. The one to property owned by Judson individually, the other to property owned by him and Cranston as partners. If the mortgage was in fact given, and if it shall be so found upon competent evidence, to indemnify Cranston against liabilities then undiscovered, which Judson had fraudulently created for his own purposes, the object of it would have no connection, in fact, either with the transfer of his partnership interest, or with the consideration paid for such transfer, if the transfer was absolute on Cranston’s assumption to pay the just debts of the firm, and the $25,000 without recourse to, or any claim upon Judson, for any balance that would be due from Mm upon a proper accounting.—2 Denio, 130, Cornell v. Todd. 1 Kern, 315 and 319-320, Craig et al. v. Wells.
If, on the other hand, it should be made to appear that the mortgage was given to secure what might be found due to Cranston upon a just accounting, as of the 5th of December, 1854, and that Cranston’s assumption of the debts of the firm and of the $25,000, was an assumption to pay them in the first instance merely, with a right to an accounting in respect thereto and of the whole copartnership business, then it would seem that it must necessarily follow that the mortgage and transfer would relate to the same matter, namely, the security and indemnity of Cranston against the liabilities he had assumed, and agreed to pay m consideration of the one, and upon the security of the other.
In the Bank of Utica v. Finch, 3 Barb. Ch. R. 293, it was expressly held, that a mortgage which, by its terms,' was given “ to secure the payment of $30,000 paid to the parties of the first part by the party of the second part,” might be shown to have been given to cover the liabilities of the mortgagor to the bank; (the mortgagee,) from time to time, including new discounts and *315 renewals of paper and subsequent loans. And on proof of that fact, the mortgagee was permitted to enforce the mortgage for its full amount, although, of the debts covered by it, when the defendant’s equities attached, not over $8,000, consisted of liabilities existing at the time the mortgage was executed.
If that case is law, it necessarily follows, that this mortgage' was not void, or ineffectual as between the parties to it, merely because its face did not disclose the precise debts or liabilities, or the nature of the debts and liabilities, which it was given to secure.
It may have been made with an actual intent to defraud, but that is not the point now under consideration.
The broad question is this, is Cranston precluded by the terms of the mortgage from showing that it was made for a legitimate purpose, and with honest motives, the precise purpose being one which its terms do not disclose ? If he is not, then, it is insisted that the ultimate question must be one of actual intent, to be decided'upon the actual facts of the case as they shall be established by evidence, and not upon the terms of the mortgage alone, with proof merely, that there was no existing debt of $25,000, then due from Judson to Cranston.
If the Bank of Utica v. Finch be law, then it was competent for Cranston, as between himself and Judson, if $25,000 of paper fraudulently issued by Judson in the firm’s name, had been subsequently disclosed and paid by Cranston, to have filed a bill, alleging the mortgage and the facts, and on proof of the facts he could have 'enforced it, to reimburse himself the $25,000. And it is contended, if this be so, that the mortgage, whether it is or is not a part of the same transaction as the transfer, would not necessarily make the latter void.
Jackson v. Brush, 20 J. R. 10, is not in conflict with the Bank of Utica v. Finch. The former presented the case of a deed to two grantees absolute on its face. The pretence made in support of it was, that it was executed to secure a debt owing by the grantor to one of the grantees, and to enable them to sell the property, and pay the grantor’s debts, and render the surplus to him, if there was any.
A verdict was taken, subject to the opinion of the Court, on a case containing the evidence. The Court held that the deed *316 was executed without any consideration, and when the grantor was largely in debt, and of course,- that it was made with .intent to hinder, delay, and defraud creditors. But the Court was careful to say (p. 11) that “ if this deed had been given to Livingston (the creditor), alone, to secure the alleged debt of $300, and the existence of that debt at its date -had been shown, it would present a different case.” . ...
In Darling v. Rogers, 22 Wend. 483, where an assignment, upon trust to sell or mortgage, was assailed by a judgment and execution creditor of the assignor, the Court upheld the assignment, although the trust to mortgage was conceded to be void. An honest actual intent having been found, and the trust to sell being valid, the Court of last resort held itself bound'by the statute to carry the deed into effect, according- to the intent of the parties, so far as that intent could be seen, and was consistent with the rules of law. (1 R. S. 739, § 2.)
An assignment, made by an insolvent, of his property, upon trusts prohibited, and by law-declared to be void, may, not um reasonably, be deemed to furnish some evidence.that it was made, with intent to hinder, delay, or defraud creditors.
There is a great difference between an assignment of properly to a third person intrust, and a transfer of it. to a creditor by way of security or mortgage. The effect of the one upon the legal rights and remedies of general creditors, is very different from that of the other.
In the first case, the title is vested in trustees, and those not provided for, if compelled to wait until -the execution of the trust, in order to reach the surplus, as they- would be if it was upheld, would necessarily be hindered and delayed, and the property to which they would be entitled would be withdrawn from the reach of process, pending the execution of the trust.
But when property is mortgaged to a creditor, the mortgagee only acquires, in equity, a specific lien upon it. The residuary interest may be reached by bill in equity, or by execution, according to its nature. The. creditor is not obliged to postpone action until the determination of a trust, or for a single moment. He is not, therefore, hindered or delayed, in a legal sense. He has only been postponed to creditors as meritorious as himself(Leitch v. Hollister, 4 Coms. 211.)
*317 The argument in support of the rights of the mortgagee to show the actual purpose and object of the mortgage, notwithstanding the falsity of the consideration stated in it, is, that as the mortgage is valid on its face, whether it is fraudulent or not is a question of fact, to be determined upon all the facts of the case, as to the real purpose and motive with which it was made.
That it does not disclose on its face the nature or actual extent of the liabilities it was given to secure, may be a circumstance with others, or of itself, to show a fraudulent intent.
An attempt, or assertion of a right or purpose to enforce it, contrary to its real object, and adverse to the just rights of the individual creditors of Judson, would also be evidence on the question of an actual intent to defraud.
But if it be true that it was given for a purpose which the law approves, and if it be true that a court of equity would allow the truth to be alleged and proved, and would thereupon give it effect accordingly, as between the parties to it, then it is argued that it can only be avoided by its appearing upon the whole evidence that it was made with an intent to hinder, delay, or defraud the creditors of Judson.
“ The question of fraudulent intent, in all cases arising under the provisions of” the chapter of the R. S., entitled “ of fraudulent conveyances and contrasts, relative to real and personal property,” “ shall be deemed a question of fact, and not of law.” (2 R. S. 137, § 4.) The terms of a transfer, it must be admitted, may furnish satisfactory evidence of such an intent, and be alone sufficient to warrant the finding of that fact.
But it is insisted that when the instrument assailed is good and valid, so far as it is affected by matters appearing on its face, and as the existence of a fraudulent intent depends upon extrinsic facts to be proved, all evidence in relation to the objects and purposes of the instrument should be received, which would be admissible in an action to enforce it to secure results not provided for by its terms, but upon settled principles, held to be consistent with it.
Having come to the conclusion, that the mortgage was executed to secure Oranston against undiscovered liabilities, which he had just grounds to apprehend Judson might have contracted fraudulently in the firm’s name, and that the transfer of Judson’s. *318 interest in the partnership effects was absolute, and upon adequate consideration, and was made with honest motives and for just purposes, the mortgage, as the evidence now stands, had no such connection with the transfer in fact, or in the intent of the parties, as necessarily to avoid the transfer, even if the mortgage could not be upheld as to the property it covers.
It, therefore, becomes unnecessary to the disposition of this appeal, upon the evidence which it brings before us, to decide whether as against the creditors of the mortgagor, the falsity of the consideration stated would be evidence prima facie, or conclusive, of a fraudulent intent in making it.
That question is one of great practical importance, and we do not deem it expedient to express any opinion in relation to it, as the decision of it is unnecessary in order to dispose of this appeal, or so far as we can now discover, for the re-trial of this action.
It is proper to observe, that the Court should have disposed at the trial absolutely of all questions of liability, and the reference should have directed only such details to be ascertained as were necessary to be known to carry the judgment into effect.
Having come to the conclusion, that a new trial must be ordered, it would be a waste of time to discuss, and decide the questions whether Judson was improperly admitted as a witness, or whether Cranston was erroneously rejected. It is not apparent, that under the act of April 13th, 1857, the same questions can arise on the re-trial of the action.
A new trial should be ordered, with costs to abide the event.
Duer, Ch. J., concurred in holding the following conclusions of fact and of law, and in the views' contained in the opinion of Bosworth, J., in support of them.
“ Whether the assignment was made with intent to hinder, delay, or defraud the creditors of Judson, is a question of fact and not of law.
The Court in its formal statement of the facts which it found the evidence established, has not found as a fact, that the trans? fer was made with that intent.
The conclusion and judgment, stated in the judgment itself, that it was made with such intent, must be deemed to have been, in the mind of the Court, a conclusion of law from the facts *319 specially found. This is made quite obvious from the opinion of the Court at Special Term.
If the material facts, from which, the conclusion of an intent to defraud has been deduced as one of law, have been erroneously found upon the evidence given, there must be a new trial.
Upon the evidence given, our conclusions are, as follows :
1. Cranston agreed to pay for the transfer of Judson’s interest more than it was worth, and more than could have been obtained for it from any other person, or by any mode of sale either public or private.
2. That in such purchase and transfer the good will of the business was estimated and included.
3. That Cranston as a consideration for the transfer agreed to pay all the copartnership liabilities, including the sum of $25,000, which Judson had fraudulently contracted in the firm’s name, for his own benefit.
4. That the motive and intent of Cranston in making this purchase were to save himself from being ruined by Judson, and to secure the application of the partnership property to pay the partnership debts, and thus to make an appropriation of it which was just and equitable.
5. That the giving of the mortgage for $25,000, by Judson, was not made by Cranston a condition of his accepting of the transfer, and signing the service paper, and that he would have accepted of the one and signed the other, whether the mortgage had been executed or not.
6. That the agreement to employ Judson and wife, was no part of the consideration or price paid for the transfer, and was not so understood by the parties at the time, but was an agreement extorted from Cranston by force of the embarrassments and peril in which Judson had placed him ; that all he agreed to pay for such services, was an agreement to pay for a thing which did not then exist, and on which no creditors of Judson then had a lien, and was to be paid, for an equivalent to be thereafter received, and to be paid after it had been received.
7. The dissolution was absolute and complete on the 5th of December, 1854, and Cranston would have accepted of the agreement to dissolve, if no other agreement could then have been obtained from Judson.
*320 8. That the agreement for a dissolution, the agreement to employ Judson and wife, and the transfer of Judson’s interest, on the consideration agreed to be paid, of themselves, upon the evidence as it stands, do not warrant the conclusion, that the transfer was made with an intent to defraud.
9. The mortgage was given to indemnify Cranston against liabilities then undiscovered, and which he might be compelled to pay, and which Judson might have fraudulently contracted in the firm’s name. There were such strong-reasons to apprehend the existence of undiscovered liabilities of that character, that the taking of a mortgage to indemnify and protect himself against them, would be no evidence that Cranston’s intent, in taking a mortgage for that purpose, was fraudulent.
10. It was as just and reasonable for Cranston to take a mortgage for such a purpose, as for any other creditor of Judson to take security for his debts against, or his liabilities on account of Judson.
11. A mortgage, for such a purpose, has no connection in fact, nor any necessary connection in intent, with a contract to pay a just consideration to Judson for his interest in the partnership business.
12. As between the parties to it, its real purpose may be shown, and on that purpose being established, the Court would enforce it, so as to make it subserve the purposes for which it was executed.
Whether, as against the creditors of the mortgagor, the falsity of the consideration stated would be evidence, prima facie or conclusive, of a fraudulent intent, is a question we deem it unnecessary to determine.
13. Even if the mortgage could not be upheld, as to the property it covers, it does not follow that its invalidity against creditors will necessarily avoid the transfer of the partnership assets. They do not, in terms, relate to the same matter or property. The mortgage does not relate to the partnership property, nor to the liabilities which Cranston agreed to assume and pay, in consideration of a transfer to him of Judson’s interest.
The conclusion is not authorized, by any facts correctly found, that the two were part of one transaction, in any such sense, that Cranston would not have taken the transfer, on the terms on *321 which he did take it, if Judson had refused to execute the mortgage.
14. As many of the most material facts, as found, are not warranted by the evidence, and as it is not found as a matter of fact, that the transfer was made with an intent to defraud, a new trial must be granted.
15. Cranston being a purchaser for value, it is essential to show, that in making the purchase he knew that the intent of Judson in making the transfer was fraudulent. Whatever Judson’s intent may have been, if Cranston did not purchase with knowledge of it, but if, on the contrary, purchased for a fair consideration, to protect his just rights, and those of the partnership creditors, his purchase could not be voided, merely because the intent of Judson was fraudulent.
As a new trial is unavoidable, it is unnecessary now, and may be useless for the purposes of a second trial, to determine whether Judson was erroneously, admitted, or Cranston erroneously rejected, as a witness.
Slosson, J., dissented.